[No. A137753. First Dist., Div. Two. Aug. 14, 2014.]

SAN FRANCISCO TOMORROW et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents;
PARKMERCED INVESTORS PROPERTIES, LLC., Real Party in Interest
and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

500

504

**COUNSEL**

Law Offices of Stuart M. Flashman and Stuart M. Flashman for Plaintiffs and Appellants.

Chatten-Brown & Carstens, Jan Chatten-Brown and Josh Chatten-Brown for Sierra Club and California Preservation Foundation as Amici Curiae on behalf of Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Kate H. Stacy, Audrey Williams Pearson and Brian F. Crossman, Deputy City Attorneys, for Defendants and Respondents.

Gibson Dunn & Crutcher, Daniel Kolkey, Jeffrey D. Dintzer and Matthew C. Wickersham for Real Party in Interest and Respondent.

Opinion

KLINE, P. J.—

## INTRODUCTION

Appellants San Francisco Tomorrow and Parkmerced Action Coalition (PMAC) appeal the San Francisco Superior Court's denial of appellants' petition for writ of mandate seeking to overturn the decision by respondents City and County of San Francisco (City) and its board of supervisors (Board) approving the Parkmerced Development Project (the project). The project involves the long-term redevelopment of the privately owned, 152-acre Parkmerced property by real party in interest Parkmerced Investors Properties, LLC.

Appellants challenge the court's denial of their writ petition contending: (1) The "Land Use Element" (sometimes called the "Urban Design Element") of the San Francisco General Plan (General Plan) is inadequate for failing to include standards for population density and building intensity. (Gov. Code, § 65302, subds. (a), (b).) (2) The project and the various project approvals are inconsistent with the "priority policies" and other policies of the General Plan. (3) The environmental impact report (EIR) and the findings underlying the City's approval of the project were inadequate under standards established by the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.). (4) The court erred in sustaining a demurrer to appellant PMAC's cause of action for violation of its due process rights. (5) The court erred in including in the administrative record transcripts of proceedings before an advisory body that were not before the Board when it certified the EIR and approved the project. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Project*

The project involves major modifications to Parkmerced, a 3,221-unit residential rental complex on 152 acres. The site is located near Lake Merced, in the southwest corner of San Francisco. It is surrounded by the Stonestown Galleria shopping mall, San Francisco State University, two golf courses, and residential neighborhoods.

The original Parkmerced complex was built in the 1940s by MetLife as one of eight large-scale developments created around the country to provide affordable middle-income housing. The architect for Parkmerced was the New York City firm Leonard Schultze & Associates and its design involved

noted San Francisco architect Frederick H. Meyer. The landscape plan was designed by famed San Francisco architect Thomas Church, designer of the master plans for the University of California, Berkeley and Santa Cruz campuses, among other notable landscapes. Originally consisting of 192 acres and 3,483 residential units, significant portions of the site were sold off to San Francisco State University and to various private owners. The remaining complex, which is the subject of the project and resulting CEQA review, consists of 152 acres and 3,221 residential units. Parkmerced Investors has owned the complex since October 2005. The complex's housing is currently divided between eleven 13-story towers containing 1,683 rental units and 170 two-story "townhouse" buildings containing 1,538 units. Over the course of 20 to 30 years, the project would demolish all townhouse units, build an equal number of replacement units and add 5,679 units for a total of 8,900 units. Of the new nonreplacement units, some would be rental units, while others would be sold. Some of the new units would be below-market-rate units, as required by City ordinance. The remainder would be market-rate units.

As described, "The proposed Project is a long-term (approximately 20–30 years) mixed-use development program to comprehensively re-plan and re-develop the approximately 116-acre Site (152-acres including streets). The Project proposes to increase the residential density, provide new commercial and retail services, provide new transit facilities, new parks and open space amenities and improve existing utilities and stormwater management systems within the development Site. Of the existing 3,221 residential units on the Site, approximately 1,683 units located within the 11 existing towers would remain and approximately 1,538 existing apartments would be demolished and replaced in phases over the approximately 20 to 30-year development period. As provided in the proposed [d]evelopment [a]greement, all 1,538 new replacement units would be subject to the San Francisco Rent Stabilization Ordinance and existing tenants in the to-be-replaced existing apartment units would have rights to relocate into new replacement units of equivalent size with the same number of bedrooms and bathrooms at their existing rents. An additional 5,679 net new units would also be added to the Site for a project total of 8,900 units. New buildings on the Site would range in height from 35 feet to 145 feet, and would not be taller than the existing towers, which will remain.

"Neighborhood-serving retail and office space would also be constructed as part of the proposed Project and concentrated on Crespi Drive, near the northeast part of the Site and the light-rail line. The proposed new neighborhood core would be located within walking distance of all the residences within Parkmerced. In addition, small neighborhood-serving retail establishments would be constructed outside of the neighborhood core, in proximity to residential units throughout the Site. A new preschool/elementary school and

daycare facility site, fitness center, and new open space uses including athletic fields, walking and biking paths, a new farm, which the Sponsor proposes will be organic, and community gardens would also be provided on the Project Site. Infrastructure improvements would include the installation of [a] bioswale system to retain and treat stormwater on-site and renewable energy sources, such as wind turbines and photovoltaic cells, which are detailed in the Sustainability Plan. Transportation improvements would include the realignment of the Muni M-Oceanview light-rail line through the Project Site, redesign and redevelopment of all public streets within the Project Site to meet the City's Better Streets design standards, provision of car-share and bike-sharing stations throughout the Project Site, pedestrian safety and traffic improvements to intersections adjacent to the Project Site, construction of new bicycle paths, provision of a free shuttle service to Daly City BART and other items detailed in the Transportation Plan."

B. *Project Approvals*

In addition to an EIR, prepared pursuant to CEQA, project approval also required amendments to the City's General Plan, zoning map, and planning code (to add the Parkmerced special use district [sometimes referred to as the SUD]), as well as approval of a local coastal zone permit and the negotiated development agreement between the City and real party in interest (collectively Project Approvals).

Real party in interest applied to the City for environmental review of the project in January 2008. In May 2009, the City issued a notice of preparation for the project EIR. The draft EIR (DEIR) was released for public review on May 12, 2010. A 60-day public comment period followed. The City's Historic Preservation Commission held a hearing to receive input on the DEIR. The comments and responses document was released on October 28, 2010, and informational meetings were held by the planning commission. On February 10, 2011, the planning commission held a formal public hearing and voted to certify the project's final EIR (FEIR) and to recommend that the Board approve the project and related Project Approvals.

On March 1 and 2, 2011, appellants and others filed timely appeals with the Board contesting certification of the FEIR. The Board heard the appeal on March 29, 2011, and took public comment. After close of the public comment, the Board voted to continue the item. Meanwhile, the Board's land use and economic development committee (LUEDC) took additional public comment on the remaining project approvals. The LUEDC held four hearings—on March 28, April 18, May 16, and the morning of May 24, 2011. At the May 16 and May 24 meetings, the LUEDC discussed and approved amendments to the approvals. At the end of the May 24 hearing, the LUEDC forwarded the amended documents to the Board without recommendation.

On the afternoon of May 24, 2011, the Board held a hearing on the continued EIR appeal and the project approvals. At the end of that meeting, the Board denied the appeal, upheld certification of the EIR and approved the project. On June 6, 2011, the Board finalized the project approvals. The mayor signed the approvals on June 10, 2011, and a notice of determination was filed that day.

## C. *The Petition for Writ of Mandate*

Appellants filed their "Verified Petition for Peremptory Writ of Mandate and Complaint for Injunctive and Declaratory Relief" on July 11, 2011. Disputes over the content of the record followed and appellants moved to "Clarify the Extent of the Administrative Record," seeking to exclude certain hearings from the record. The court granted in part and denied in part the motion, ordering hearings before the LUEDC and the Historic Preservation Commission to be transcribed and included in the record and excluding two hearings occurring after the Board's certification of the EIR. The trial court also granted real party's demurrer (joined in by the City) to the seventh and eighth causes of action of PMAC for declaratory relief and for violation of due process rights. The operative pleading, the "Verified Third Amended Petition for Peremptory Writ of Mandate," was filed on April 6, 2012. Following a hearing on the merits of the petition, the trial court took the matter under submission. It issued its order denying the petition on all counts on December 14, 2012. Judgment was entered on January 16, 2013, and this timely appeal followed.

## DISCUSSION

## I. General Plan Adequacy

## A. *General Plan*

■ "The Legislature has required every county and city to adopt 'a comprehensive, long-term general plan for the physical development of the county or city. . . .' (Gov. Code, § 65300.) A general plan provides a ' "charter for future development" ' and sets forth a city or county's fundamental policy decisions about such development." (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815 [65 Cal.Rptr.3d 251] (*Friends of Lagoon Valley*).)

" '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' [Citation.] 'Since consistency with the general plan is required, absence of a valid general plan, or valid relevant elements or components

thereof, precludes enactment of zoning ordinances and the like.' [Citation.] 'The general plan consists of a "statement of development policies . . . setting forth objectives, principles, standards, and plan proposals." [Citation.] The plan must include seven elements—land use, circulation, conservation, housing, noise, safety and open space—and address each of these elements in whatever level of detail local conditions require [citation].' " (*Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1182 [56 Cal.Rptr.3d 374].)

■ "The adoption or amendment of a general plan is a legislative act. (Gov. Code, § 65301.5.) A legislative act is presumed valid, and a city need not make explicit findings to support its action. [Citations.] A court cannot inquire into the wisdom of a legislative act or review the merits of a local government's policy decisions. [Citation.] Judicial review of a legislative act under Code of Civil Procedure section 1085 is limited to determining whether the public agency's action was arbitrary, capricious, entirely without evidentiary support, or procedurally unfair. [Citations.]" (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1195 [24 Cal.Rptr.3d 543].) "[O]nly those portions of the general plan which are impacted or influenced by the adoption or amendment can properly be challenged in the action which is brought." (*Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 289–290 [3 Cal.Rptr.2d 504], disapproved in part on another ground as stated in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

Appellants attack the San Francisco General Plan itself, arguing the Urban Design Element of the General Plan is inadequate for failing to include standards for population density and building intensity as required by Government Code section 65302, subdivision (a), which provides in pertinent part: "The [general] plan shall include the following elements: [¶] (a) A land use element that designates the proposed general distribution and general location and extent of the uses of the land . . . . The land use element shall include a statement of the standards of population density and building intensity recommended for the various districts and other territory covered by the plan. . . ."

The trial court concluded that a reasonable person could conclude, as did the City, that table I-27 and map I-2 in the General Plan's "Housing Element," and maps 4 and 5 in the Urban Design Element provide the information described in Government Code section 65302, subdivision (a). We agree.

■ *1. Population density.* The terms "population density" and "building intensity" are not defined by the statute. In *Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664 [188 Cal.Rptr. 233] (*Twain Harte*), the court determined "the reasonable interpretation of the term

'population density' as used in Government Code section 65302 is one which refers to numbers of *people* in a given area and not to dwelling units per acre, unless the basis for correlation between the measure of dwelling units per acre and numbers of people is set forth explicitly in the plan." (*Id.* at p. 699, fn. omitted.)

■ The Urban Design Element of the General Plan includes a "Land Use Index." This index includes land use maps and references to land use policies scattered through other elements. Appellants acknowledge, as they must, that the actual layout of a general plan is generally within the local agency's discretion. (Gov. Code, § 65301; see *Garat v. City of Riverside, supra*, 2 Cal.App.4th 259, 296 [plan may be adopted in any format deemed appropriate or convenient, including combining of elements, a single document or group of documents relating to subjects or geographic segments of the planning area].) The Land Use Index has a section labeled "Population Density and Building Intensity Standards." This section points to density and intensity standards in the commerce, industry and housing elements, and various area plans. It also has a series of maps depicting citywide guidelines for building height and building bulk, and which depict a citywide commercial and industrial density plan expressing densities in terms of a FAR (floor area ratio), the ratio between gross floor area to lot area. However, the identified "area plans" do not include the Parkmerced area.

The section of the Housing Element describing the existing housing stock contains a table (I-27, *"Generalized Housing Densities Allowed by Zoning"*) and corresponding map (I-2, *"Generalized Housing Densities Allowed by Zoning"*) that together provide an adequate description of the population densities for the Parkmerced area. Table I-27 of the Housing Element sets forth five categories of housing density (low, moderately low, medium, moderately high, and high) and specifies the types of zoning districts that relate to each category. For each category, the table states both the "average units per acre" and the "population density," in addition to describing the general locations where these density levels may be found. Map I-2, on the following page, shows the locations of each housing density category throughout the City. A narrative preceding the table and map describes them: "Table I-27 offers a listing of the City's zoning categories that permit residential development, grouping these by generalized housing density levels. Map I-2 provides a generalized illustration of housing densities citywide." The map identifies portions of the Parkmerced site as "medium density," corresponding to an average population density of 124 persons per acre, and other portions as "high density" corresponding to an average population density of 651 persons per acre. Accordingly, the General Plan includes a statement of population density (numbers of people) for the territory it covers. (See *Twain Harte, supra*, 138 Cal.App.3d at p. 699; see also *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 350 [176

Cal.Rptr. 620] [there must be a perceptible connection between density standards and locations within the jurisdiction].)

██ Government Code section 65302, subdivision (a) does not require a general plan's population density statement to be "prescriptive," rather than "descriptive," as appellants suggest. Rather, that section requires a statement of *recommended* densities, not binding or inflexible limits on density. (See *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 718 & fn. 7 [29 Cal.Rptr.2d 182] (*Sequoyah*) [map that is " 'largely illustrative in nature' " is a standard of population density under Gov. Code, § 65302, subd. (a), even though a city's approvals may occasionally deviate from details of the map].)

Moreover, respondents dispute appellants' claim that table I-27 only describes existing densities. The averages in the table correspond to specific zoning designations and general locations throughout the City, as also identified in the table. Therefore, respondents maintain, geographic locations and the zoning designations throughout the City also signal the generally recommended population density. Further, the Housing Element contemplates that new housing will generally be constructed at densities similar to the surrounding development. Therefore, table I-27 and map I-2 also project the likely future densities throughout the City. (See Housing Element pt. I, pp. 92–93 [discussion projecting future residential development on in-fill sites at lower densities in neighborhoods characterized by single-family homes, and higher densities closer to downtown and in the City's mixed-use districts].) We conclude the General Plan adequately states population densities.

**2. *Building intensity.*** Terming the General Plan building intensity standards "marginally better" than its "population density" standards, appellants argue that the Urban Design Element inclusion of a citywide map of maximum building heights, and its map identifying building bulk standards are insufficient, as the standards do not contain the usual measure of floor intensity ratios and bulk limits are set only for parts of a building exceeding a certain height.[1]

The Urban Design Element includes a map of the various permitted building heights citywide and a separate map addressing building bulk. (Land

---

[1] Policy 3.6 of the Urban Design Element states in pertinent part that "extremes in bulk should be avoided by establishment of maximum horizontal dimensions for new construction above the prevailing height of development in each area of the city. [¶] . . . [¶] The guidelines for building bulk expressed in this Plan are intended to form an urban design basis for such regulation. *These guidelines favor relatively slender construction above prevailing heights, but would not limit the horizontal dimensions of buildings below those heights.* Generally speaking, the guidelines would not limit the total floor space that could be built, but would help to shape it to avoid negative external effects. If two or more towers are to be built on a single property, their total effect should be considered and a significant separation should be

Use Index, pp. 108–109, figures VI.4, "Urban Design Guidelines for Height of Buildings," and VI.5, "Urban Design Guidelines for Bulk of Buildings Map.") The bulk map establishes maximum dimensions of buildings *above specified heights*. These height and size limitations help define the envelope or "intensity" of buildings throughout the City. They include standards for the Parkmerced site.

Building intensity for the site is further regulated through the project's General Plan amendment and SUD. Project approvals amend height map 4 to establish a boundary around the Parkmerced site and replace existing height regulations with a notation to " 'See Parkmerced Special Use District, Section 249.64 of the Planning Code and Sectional Map HT13 of the Zoning Maps.' " The SUD, in turn, establishes building height and bulk for the site through amendments to the applicable zoning height map and a bulk table. The ordinance establishing the Parkmerced SUD also contained amendments to the Planning Code identifying permitted uses in each of the newly established Parkmerced classes of use districts, as well as prohibited uses in the SUD as a whole.

■ The standards for building heights and the bulk limits for buildings above specified heights are precisely the sorts of standards called for in *Twain Harte, supra*, 138 Cal.App.3d at page 699 (standards might include "restrictions such as height or size limitations, restrictions on types of buildings or uses to be permitted within a designated area"). The building intensity requirement of Government Code section 65302, subdivision (a) was satisfied here.

**3. *Correlation of circulation element with changes in population density and building intensity.* ** Appellants suggest the General Plan is also deficient in that the "Transportation Element" is not correlated with the Land Use Element, as required by Government Code section 65302, subdivision (b). In a single paragraph in their opening brief, appellants argue that without adequate building intensity standards, the General Plan "cannot predict the increased transportation demand associated with future development and adjust the circulation element accordingly." As we have determined building intensity standards were adequate, we reject this claim.

■ Furthermore, as recognized in *Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra*, 126 Cal.App.4th at page 1196, "the internal consistency and correlation requirements do not require a city or county to limit population growth or provide traffic management measures to

required between them. The precise form of the building or buildings would in large measure be left to the individual developer and his architects under these guidelines." (Policy 3.6, italics added.)

ensure that its transportation infrastructure can accommodate future population growth. The Planning and Zoning Law (Gov. Code, § 65000 et seq.) does not require a city or county to avoid adverse impacts on transportation. Rather, the city has broad discretion to weigh and balance competing interests in formulating development policies, and a court cannot review the wisdom of those decisions under the guise of reviewing a general plan's internal consistency and correlation. [Citation.]"

As respondents point out, the Project Approvals reflect the City's decision to limit parking and roadway capacity in areas well served by transit. We do not second-guess such a policy choice.

## II. Project Consistency with the General Plan

As is often the case, the standard of review and the degree of deference this court is to apply to the decision of the City is determinative of many of the issues presented. Appellants, joined by amici curiae Sierra Club and California Preservation Foundation, contend that deference to the City's interpretation of the priority policies of the General Plan was unwarranted, because the priority policies had been enacted via a citizen's initiative, "Proposition M," rather than authored by the City itself. Appellants and amici curiae argue that the initiative must be interpreted to effectuate the intent of the voters and that the City's intent and its interpretation of the meaning of the policies are irrelevant and entitled to little, if any, deference.

Appellants and amici curiae further maintain that the priority policies must be strictly construed, as Proposition M requires that the City make findings of consistency with those priority policies for all future projects, and that the plain language of Proposition M requires a *specific* finding of consistency with each and every priority policy identified therein. Consequently, appellants and amici curiae assert that the consistency findings here were inadequate, insofar as they were based on determinations that the project was generally compatible with the priority policies or that "on balance" the project will further the priority policies and not obstruct their attainment. We disagree.

### A. Deference to the City's Interpretation of the General Plan Priority Policies

As stated by the Sixth Appellate District in *Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1562–1563 [135 Cal.Rptr.3d 380] (*Pfeiffer*): "Our evaluation of appellants' contention is governed by well established standards." " ' " 'An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their

attainment.' [Citation.]" [Citation.] State law does not require perfect conformity between a proposed project and the applicable general plan. . . . [Citations.]' (*Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 817.) In other words, 'it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . . It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan. [Citations.]' (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510–1511 [19 Cal.Rptr.3d 1].)" (*Pfeiffer,* at pp. 1562–1563.)

We addressed the applicable standard of review—abuse of discretion—more than two decades ago in *Sequoyah, supra,* 23 Cal.App.4th at page 717: "The city council's determination that the . . . project is consistent with the [city's general plan] comes to this court with a strong presumption of regularity. [Citation.] To overcome that presumption, an abuse of discretion must be shown. (Code Civ. Proc., § 1094.5 [citation].) An abuse of discretion is established only if the city council has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence. (Code Civ. Proc., § 1094.5, subd. (b).) We may neither substitute our view for that of the city council, nor reweigh conflicting evidence presented to that body. [Citation.]" (Accord, e.g., *Pfeiffer, supra,* 200 Cal.App.4th at p. 1563 [according "great deference" to the agency's consistency determination]; *Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 816; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 [32 Cal.Rptr.3d 177] (*Endangered Habitats*); *Sierra Club v. County of Napa, supra,* 121 Cal.App.4th 1490, 1509–1510 (*Sierra Club*).)

Even those cases relied upon by appellants for the proposition that the priority policies must be strictly construed recognize and apply the abuse of discretion standard of review. *Endangered Habitats, supra,* 131 Cal.App.4th 777, agreed that appellate courts "review decisions regarding consistency with a general plan under the arbitrary and capricious standard. These are quasi-legislative acts reviewed by ordinary mandamus, and the inquiry is whether the decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. [Citations.] Under this standard, we defer to an agency's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it. [Citation.]" (*Id.* at p. 782.) Similarly, *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332 [74 Cal.Rptr.2d 1] (*FUTURE*), also acknowledged: "The Board's determination that [the project] is consistent with the Draft General Plan carries a strong presumption of regularity. (*Sequoyah, supra,* 23 Cal.App.4th at p. 717.) This determination can be overturned only if the Board abused its discretion—that is, did not

proceed legally, or if the determination is not supported by findings, or if the findings are not supported by substantial evidence. (*Ibid.*) As for this substantial evidence prong, it has been said that a determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, '. . . a reasonable person could not have reached the same conclusion.' [Citation.]" (*Id.* at p. 1338.)

No case cited by appellants or found by us refuses to apply this deferential standard to the determination by a local agency that a particular project was consistent with its general plan.

■ Appellants and amici curiae argue that the reason for deference to the local legislative body is absent where, as here, the amendment to the General Plan that set forth the priority policies was not proposed by the City, but was the result of an initiative adopted by the voters over opposition of many members of the Board. It is true that many cases explain that reviewing courts accord great deference to the agency's determination " 'because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.]' " (*Pfeiffer, supra,* 200 Cal.App.4th at p. 1563; see, e.g., *Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 816; *Sierra Club, supra,* 121 Cal.App.4th at p. 1509; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 [104 Cal.Rptr. 2d 326] (*Save Our Peninsula*).)

However, the Board's role in implementing the General Plan, including its discretion to determine whether proposed projects are consistent with the General Plan, is at least as important. The above cases also recognize that " '[b]ecause policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.]' " (*Pfeiffer, supra,* 200 Cal.App.4th at p. 1563; see *Sierra Club, supra,* 121 Cal.App.4th at pp. 1509–1510; *Save Our Peninsula, supra,* 87 Cal.App.4th at p. 142.) Such deference to the actions of the legislative body stems from well-settled principles of court respect for the separation of powers. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 572 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*) ["[E]xcessive judicial interference with the [agency's] quasi-legislative actions would conflict with the well-settled principle that the legislative branch is entitled to deference from the courts because of the constitutional separation of powers. (Cal. Const., art. III, § 3; [citations].)"].) Furthermore, the agency's decisions regarding project consistency with a general plan are reviewed by ordinary mandamus. The inquiry in such cases is "whether the decision is arbitrary, capricious, entirely lacking in

evidentiary support, unlawful, or procedurally unfair. [Citations.]" (*Endangered Habitats, supra,* 131 Cal.App.4th at p. 782; cf. Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶ 8:128.2, p. 8-90 (rev. # 1, 2013) [EIR determinations upheld if supported by substantial evidence].)

Nor do we find persuasive the claims of appellants and amici curiae that policy reasons supporting liberal interpretation of citizens' initiative measures suggest affording less deference to the City's consistency findings here. Unlike *Perry v. Brown* (2011) 52 Cal.4th 1116, 1165 [134 Cal.Rptr.3d 499, 265 P.3d 1002], holding that sponsors of citizens' initiatives must be allowed to defend their validity, this case does not involve a challenge to the *validity* of a citizen's initiative. Rather, it is a challenge to the City's *application* of the General Plan and, specifically, to the City's interpretation and application of the priority policies adopted by Proposition M and found today in section 101.1, subdivision (a) of the City's planning code. The same rules of construction that apply to other amendments to the planning code or to the General Plan apply here. "Once an initiative measure has been approved by the requisite vote of electors in an election, . . . the measure becomes a duly enacted constitutional amendment or statute." (*Perry,* at p. 1147.) As our Supreme Court has observed, " 'Although the initiative power must be construed liberally to promote the democratic process [citation] when utilized to enact statutes, those statutes are subject to the same constitutional limitations and rules of construction as are other statutes.' (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 675 [194 Cal.Rptr. 781, 699 P.2d 17].) The same is true when a local initiative is at issue." (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540 [277 Cal.Rptr. 1, 802 P.2d 317].)

Any other conclusion would undermine the well-established limited role of judicial review in these types of cases and could lead to unworkable results, such as requiring application of *different* standards of review to consistency determinations in the same proceeding where some General Plan policies were adopted by initiative and others by the agency.[2]

---

[2] Respondents contend Proposition M was not a pure citizen's initiative, as four members of the Board acted to put Proposition M on the ballot. The parties disagree whether such act was "ministerial" or done independently by the members in accordance with the San Francisco Charter. Such dispute only further supports our view that the standard of review for consistency determinations should not hinge on the method by which a general plan was adopted or amended.

We do not agree with amici curiae's argument based upon *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1. 960 P.2d 1031] (*Yamaha*), that less judicial deference should be afforded to the City's interpretation of its General Plan in this case, as the standard of review is "fundamentally *situational.*" (*Id.* at p. 12.) The *situation* here does not change based on the author of the relevant part of the general plan any more than

## B. *Priority Policies Need Not be Strictly Construed*

Relying upon *Endangered Habitats, supra,* 131 Cal.App.4th 777 and *FUTURE, supra,* 62 Cal.App.4th 1332, appellants and amici curiae argue that the priority policies of the General Plan were fundamental, mandatory and clear. Consequently, they contend, project approval required findings that the project complied with each and every one of the strictly construed priority policies and the Board was not permitted to weigh and balance the various policies when considering project compliance. Again, we disagree.

When we apply the abuse of discretion standard of review, " 'the nature of the policy and the nature of the inconsistency are critical factors to consider.' (*FUTURE, supra,* 62 Cal.App.4th at p. 1341.) In addition, general consistencies with plan policies cannot overcome 'specific, mandatory and fundamental inconsistencies' with plan policies. (*Id.* at p. 1342.)" (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 239 [128 Cal.Rptr.3d 733].)

As we recognized in *Sequoyah, supra,* 23 Cal.App.4th 704, "[N]o project could completely satisfy every policy stated in the [general plan], and . . . state law does not impose such a requirement. [Citations.] A general plan must try to accommodate a wide range of competing interests—including those of developers, neighboring homeowners, prospective homebuyers, environmentalists, current and prospective business owners, jobseekers, taxpayers, and providers and recipients of all types of city-provided services—and to present a clear and comprehensive set of principles to guide development decisions. Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial

---

changing membership in the agency that adopts a general plan would result in a changing standard of review. Further, we observe that *Yamaha* was cited in *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656 [25 Cal.Rptr.2d 745], as authority for application of the traditional, highly deferential standard of review in a challenge to a project's compliance and consistency with the City's General Plan: "The inquiry for the issuance of a writ of administrative mandamus is whether the agency in question prejudicially abused its discretion; that is, whether the agency action was arbitrary, capricious, in excess of its jurisdiction, entirely lacking in evidentiary support, or without reasonable or rational basis as a matter of law. (Code Civ. Proc., § 1094.5, subds. (b), (c); *Yamaha*[, *supra,*] 19 Cal.4th [at pp.] 10–12 . . . ; [citations].)" (*Id.* at pp. 673–674.)

evidence. [Citations.]" (*Id.* at pp. 719–720; accord, *Pfeiffer, supra,* 200 Cal.App.4th at p. 1563; *Sierra Club, supra,* 121 Cal.App.4th at pp. 1509–1510.)

In *Endangered Habitats, supra,* 131 Cal.App.4th 777, and *FUTURE, supra,* 62 Cal.App.4th 1332, appellate courts held the findings of consistency made by the respective counties were unsupported by substantial evidence (*FUTURE,* at p. 1342) and that "no reasonable person could have made the consistency finding on the record" (*Endangered Habitats,* at p. 789). In each case, the appellate court determined the land use project at issue to be inconsistent with very *specific* and mandatory policies of the applicable general plan. (*Endangered Habitats,* at pp. 785–786, 789; *FUTURE,* at p. 1342.)

As described by *Friends of Lagoon Valley, supra,* 154 Cal.App.4th at page 819, "the general plan in *Endangered Habitats*[, *supra,* 131 Cal.App.4th 777,] required the maintenance of specific levels of service at certain intersections as computed using a specific methodology.[3] (*Id.* at pp. 782–783.) Although an EIR determined cumulative traffic impacts were not significant under a different methodology, the court remarked this fact was 'of no import' given the unambiguous requirements of the general plan. (*Id.* at p. 783.)" The traffic level service policy, by establishing a particular performance standard to be evaluated by a particular methodology was "mandatory" and "clear," such that the project that could not meet the performance standard under the required methodology, was inconsistent with the general plan. (*Endangered Habitats,* at pp. 782–783.) Furthermore, the general plan at issue in *Endangered Habitats* explicitly did not allow balancing of certain identified policies. Rather, it mandated compliance with a specific plan in order to maintain a buffer between urban development and a national forest. The specific plan distinguished between mandatory and permissive provisions and a consistency checklist explained that " ' "shall" indicates a mandatory [r]egulation to which there are no exceptions, while "should" indicates a non-mandatory [g]uideline.' " (*Id.* at pp. 785–786.) The *Endangered Habitats* court concluded that the specific plan amendment allowing the specific plan regulations to be balanced was in direct conflict with the general plan policy that new

---

[3] In *Endangered Habitats, supra,* 131 Cal.App.4th 777, "A 'traffic level of service policy' addresses the need for highway improvements when development increases traffic. County policy is that improvements must be made within a stated time after issuance of various permits so as to achieve level of service (LOS) D at intersections, and LOS C on Santiago Canyon Road. Here is the relevant language: 'LOS C shall . . . be maintained on Santiago Canyon Road links until such time as uninterrupted segments of roadway (i.e., no major intersections) are reduced to less than three miles.' This policy requires compliance to be evaluated according to the county's Transportation Implementation Manual, which in turn provides that traffic analysis on Santiago Canyon Road 'shall' use the methods described in the highway Capacity Manual (HCM)." (*Id.* at p. 783.)

development must comply with all specific plan policies. (*Id.* at p. 787.) The balancing provision of the amendment was held to be inconsistent with the general plan and no reasonable person could find it consistent. (*Id.* at p. 788.)

Similarly, the general plan in *FUTURE, supra,* 62 Cal.App.4th 1332, specified without exception that the designation "low density residential" would be restricted to certain areas. The project proposed to develop "low density residential" in another area. It was "readily apparent" the project directly conflicted with a mandatory policy set forth in the general plan. (*Id.* at pp. 1340–1341.) The appellate court held there was no substantial evidence supporting the county's implied finding of consistency, concluding that "[n]o reasonable person, on the evidence before the Board, could conclude otherwise." (*Id.* at p. 1341; see *Sierra Club, supra,* 121 Cal.App.4th at p. 1511.)

As stated above, the priority policies adopted by Proposition M are found in section 101.1 of the City's planning code, which provides in relevant part:

"SECTION 101.1. MASTER PLAN CONSISTENCY AND IMPLEMENTATION

"(a) The Master Plan shall be an integrated, internally consistent and compatible statement of policies for San Francisco. To fulfill this requirement, after extensive public participation and hearings, the City Planning Commission shall in one action amend the Master Plan by January 1, 1988.

"(b) The following Priority Policies are hereby established. They shall be included in the preamble to the Master Plan and shall be the basis upon which inconsistencies in the Master Plan are resolved:

"(1) That existing neighborhood-serving retail uses be preserved and enhanced and future opportunities for resident employment in and ownership of such business enhanced;

"(2) That existing housing and neighborhood character be conserved and protected in order to preserve the cultural and economic diversity of our neighborhoods;

"(3) That the City's supply of affordable housing be preserved and enhanced;

"(4) That commuter traffic not impede Muni transit service or overburden our streets or neighborhood parking.

"(5) That a diverse economic base be maintained by protecting our industrial and service sectors from displacement due to commercial office

development, and that future opportunities for resident employment and ownership in these sectors be enhanced;

"(6) That the City achieve the greatest possible preparedness to protect against injury and loss of life in an earthquake;

"(7) That landmarks and historic buildings be preserved; and,

"(8) That our parks and open space and their access to sunlight and vistas be protected from development."

Subdivisions (c) and (d) of section 101.1 of the planning code provide that the City may not adopt any zoning ordinance or development agreement authorized pursuant to Government Code section 65865, unless, "prior to that adoption it has specifically found that the ordinance or development agreement is consistent with" the priority policies and the City's master plan. Subdivision (e) of section 101.1 provides that similar consistency findings "shall" be made by the City before "issuing a permit for any project or adopting any legislation which requires an initial study under [CEQA], and prior to issuing a permit for any demolition, conversion or change of use, and prior to taking any action which requires a finding of consistency with the Master Plan."

The language of section 101.1, subdivision (b) of the City's planning code, that the priority policies are to "be the basis upon which inconsistencies in the Master Plan are resolved," does not remotely provide the type of specificity and clarity that is found in the general plan policies of either *FUTURE, supra,* 62 Cal.App.4th 1332 or *Endangered Habitats, supra,* 131 Cal.App.4th 777. A reasonable person could conclude that such language allows the City to weigh and balance the priority policies and to construe them in light of the purposes of the General Plan. As for the specific priority policies themselves, the plain language of these policies lacks the type of directive courts use to determine whether a policy is mandatory—use of words such as "must" or "shall." Our reading of the priority policies here persuades us they are neither "mandatory" nor "clear," and the project does not directly conflict with them, unlike the plans in *FUTURE* and *Endangered Habitats,* where the project in each case directly conflicted with one or more specific and mandatory policies set forth in the general plans to the degree that no reasonable person could conclude they were consistent. While the City planning code requires that procedurally, a project must be found consistent with the policies, the policies themselves contain no objective standards, but only subjective standards that neither prohibit any particular development or type of development nor command any particular outcome.

■ Nearly 30 years ago, immediately after passage of Proposition M, the San Francisco City Attorney issued an analysis of that measure, observing

that "[t]here is no evidence that in passing Proposition M, the voters intended to alter the City's practice of determining consistency by considering the relevant policies as a whole" and concluding that "the consistency requirement of Proposition M calls for a balancing of the eight Priority Policies rather than strict compliance with each and every one. Subject to the other provisions of Proposition M and the Code, the City Planning Commission [or other entity required to make the consistency finding] may approve each project . . . if, after considering all aspects of the project, the Commission concludes that approval of the project would further the Priority Policies and not obstruct their attainment. If a particular action would advance some Policies while frustrating others, a finding of consistency would be proper only if the Commission concludes that the benefits in furthering some of the Policies outweigh the harm in impeding others." (S.F. City Atty., Opn. No. 86-17 (Dec. 16, 1986) pp. 15–16, fn. omitted.) The opinion pointed out that "[t]here is no evidence that in passing Proposition M, the voters intended to alter the City's practice of determining consistency by considering the relevant policies as a whole" (*id.,* pp. 14-15)—an approach approved by this division in *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 915–916 [165 Cal.Rptr. 401]. Furthermore, applying this standard to Proposition M comports with the settled rule that where legislation is ambiguous, courts should give it " 'a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical and that will lead to a wise policy rather than to mischief or absurdity [citation].' [Citation.]" (*County of Orange v. Barratt American, Inc.* (2007) 150 Cal.App.4th 420, 432–433 [58 Cal.Rptr.3d 542].) As the city attorney observed at the time, "Construing [P]roposition M to require that every action be consistent with each of the eight Priority Policies would lead to the extreme result of blocking most planning actions." (S.F. City Atty., Opn. No. 86-17, *supra,* p. 15.) In two somewhat prescient examples, the city attorney pointed out that priority policy No. 3, encouraging affordable housing projects, would likely violate priority policies Nos. 1 and 2, if the projects replaced existing housing or existing retail businesses; and that the priority policy of preserving existing affordable housing (priority policy No. 3) could easily conflict with the priority policy of achieving the greatest possible earthquake preparedness (priority policy No. 6). (*Ibid.*) We agree with the city attorney's long-settled construction of this legislation and with its observation that "requiring perfect consistency with each of the Priority Policies could prevent many, if not all, affordable housing projects." (*Ibid.*)

## C. *Priority Policy Consistency Determination*

Appellant challenges the City's findings that the project and its accompanying approvals were consistent with priority policies Nos. 2, 4, 6, 7 and 8.

Amici curiae join appellants in arguing that the project is inconsistent with policies Nos. 2 and 7. In finding that the development agreement was in conformity with the General Plan, as amended, and the eight priority policies of San Francisco Planning Code section 101.1, the Board adopted and incorporated by reference the findings made by the planning commission. The planning commission had found that the development agreement and related approval actions were, "on balance," consistent with the General Plan and with the priority policies of San Francisco Planning Code section 101.1, subdivision (b), stating its reasons, in relevant part as follows:

"[Priority Policy No. 2] The existing housing and neighborhood character will be conserved and protected in order to preserve the cultural and economic diversity of our neighborhoods:

"The proposed Project would preserve the existing diversity and character of Parkmerced by maintaining the same number of rent controlled units (3,221 rent controlled units) that currently exist at Parkmerced. The Project would accomplish this by conserving 1,683 existing rent controlled apartments, which would remain subject to the Rent Stabilization Ordinance, and replacing all 1,538 existing rent controlled apartments that would be demolished by the Project with a new unit that would be subject to the same protections as contained in the Rent Stabilization Ordinance for the life of the building. In addition, under the proposed Project, residents of buildings proposed for demolition would be given the opportunity to relocate to such replacement units in a new building and would be assessed the same rent as their previous unit. The Project would also enhance the diversity of Parkmerced by constructing a large number of new BMR [below market rate] affordable units. Currently, Parkmerced has no BMR units. Further, the proposed Project would enhance the character of the Parkmerced neighborhood by establishing a social and commercial core, improving pedestrian accessibility, and creating open space and recreational opportunities. [¶] . . . [¶]

"[Priority Policy No. 4] The commuter traffic will not impede MUNI transit service or overburden our streets or neighborhood parking:

"The proposed Project would enhance MUNI transit service by re-routing the MUNI M-Oceanview light-rail line through the Project Site, creating two new stations and relocating the existing Parkmerced/SFSU station. These improvements would alleviate the overcrowding issues at the existing Parkmerced/SFSU station and improve the connection to SFSU by requiring riders to cross Holloway Avenue as opposed to Nineteenth Avenue. The realignment would also reduce the walking distance to transit for residents of Parkmerced, thereby encouraging the use of public transportation. In addition, the proposed roadway re-alignments would ease the burden on City streets in

the Parkmerced area by improving traffic flow. Finally, the proposed Project would add approximately 90 on-street and 6,252 off-street parking spaces, ensuring that residents of the proposed Project do not rely on parking in the adjoining neighborhoods. [¶] . . . [¶]

"[Priority Policy No. 6] The City will achieve the greatest possible preparedness to protect against injury and loss of life in an earthquake.

"The proposed Project would help the City achieve the greatest possible preparedness to protect against injury and loss of life in an earthquake because the new buildings would be constructed in accordance with all applicable building codes and regulations with regard to seismic safety.

"[Priority Policy No. 7] That landmark and historic buildings will be preserved:

"The proposed Project would not adversely impact any City landmarks because there are no City-designated landmarks on the Project Site. Although none of the buildings on the Project Site are designated City landmarks, as mitigation for the Proposed Project's impacts to historic resources under [CEQA], the Project Sponsor will prepare documentation of the site based on the National Park Service's Historic American Building Survey/Historic American Engineering Record Historical Report Guidelines and provide a permanent display of interpretative materials concerning the history of the original Parkmerced complex.

"[Priority Policy No. 8] Parks and open space and their access to sunlight and vistas will be protected from development:

"The proposed Project would provide 68 acres of open space in a network of publically accessible neighborhood parks, athletic fields, public plazas, greenways and a farm. The Project would provide significant additional open space in the form of private or semi-private open space areas such as centralized outdoor courtyards, roof decks, and balconies. These private and semi-private open spaces would be required within the development of each residential building within Parkmerced. The parks and open space would be more accessible and usable than the current open spaces. Parks and open space within, and in the vicinity of, the proposed Project would continue to receive a substantial amount of sunlight during the day when use is at its highest rate. Existing coastal views from parks located to the east and north of the Project Site would be maintained with implementation of the proposed Project."

The priority policy consistency findings made by the City are supported by the reasons given by the planning commission and are supported by the

record. We cannot conclude that no reasonable person would make such determinations. Appellants' and amici curiae's challenges to these findings are based upon their rigid reading of the priority policies and their refusal to recognize the general rule giving discretion to the Board to balance the numerous General Plan priorities.

### D. *Project Consistency with Other General Plan Policies*

Appellants contend that other policies in the General Plan echo the priority policies and that project approvals are also inconsistent with those policies.[4] Having rejected appellants' premise—that the project and Project Approvals were inconsistent with the priority policies—we also reject their conclusion. Nevertheless, we briefly address the claims of inconsistency.

**1.** *Housing element policy 3.6 consistency determination.* Housing element policy 3.6 states: "Preserve Landmark and Historic Residential Buildings." This policy is by its terms more narrow than priority policy No. 7, as it is limited to historic *residential* buildings. Parkmerced does not contain any landmark or historic *buildings*, residential or otherwise. A reasonable person could conclude the project and project approvals were not inconsistent with this general plan element.

**2.** *Community safety element policy 2.11 regarding hazards from gas lines.* Appellants contend community safety element policy 2.11, which states, "reduce hazards from gas fired appliances and gas lines," is similar to priority policy No. 6. Appellants argue the project site is located "very close to major [Pacific Gas and Electric Company] gas pipelines" and that the "Planning Department attempted to belittle the risk involved using data . . . that antedated the San Bruno [pipeline] explosion of the previous fall." Appellants urge the data used by the City antedated the San Bruno explosion and they speculate that the project "will impede emergency response to a foreseeable catastrophic failure . . . ." The City consulted federal authorities as to the location of gas pipelines (noting that "the closest gas transmission line to the Project Site is PG&E's Line 109, which generally follows Alemany Boulevard," outside project boundaries) and as to the risk of gas line explosions, finding them "rare." The City's risk assessment *did* take into consideration the San Bruno

---

[4] Appellants appear to have reversed the order of priority policies Nos. 6 and 7 in arguing that other policies, analogous to priority policies, were violated. We address the issue as appellants appear to have intended, pairing housing element policy 3.6, relating to landmark and historic residential buildings, with priority policy No. 7 (landmark and historic building preservation) and community safety element policy 2.11 with priority policy No. 6 (earthquake preparedness).

incident.[5] The City's reliance on building codes and regulations to assist in its determination that a project will reduce potential hazards was proper. (See *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 904 [124 Cal.Rptr.3d 755] [compliance with building codes and the other regulatory provisions, in conjunction with a detailed geotechnical investigation, provided substantial evidence that the mitigation measures would reduce seismic impacts to a less than significant level].) Also relevant is the City's response to the earthquake preparedness priority policy No. 6, that "new buildings would be constructed with all applicable building codes and regulations with regard to seismic safety," including recommendations from the geologic, geotechnical and seismic study conducted for the project in May 2008. The City determined appellants' argument was "speculative" as it had been presented with no data or evidence that PG&E pipelines in the vicinity of the project posed a hazard to residents or visitors that would result from implementation of the proposed project.

We conclude a reasonable person could have reached the conclusion reached by the City here that the project was consistent with community safety element policy 2.11.

E. *Project Consistency With Numerous Other Additional General Plan Objectives and Policies*

As in *Sequoyah, supra,* 23 Cal.App.4th 704, appellants here challenge the project on the basis of seven of the numerous policies and objectives encompassed in the General Plan (which City numbers at 78 or more). Given the standard of review here and the discretion vested in the City to weigh and balance General Plan policies in its determination whether the project is consistent with the General Plan (*id.* at p. 719), we would be hard pressed to overturn the City's determination in this case were we to find it unsupported with respect to a single policy. After identifying at least 78 objectives and policies in the Housing, Urban Design, and Transportation Elements with which the project is consistent, the City found that replacing the Parkmerced housing development, designed to separate land uses and rely extensively on automobile use, with a modern and sustainable development that will alleviate the City's housing shortage, promote transit use, and increase energy

[5] "In California, the 10-year average (2001–2010) of significant incidents relating to gas distribution pipelines is 6 incidents, 0 fatalities, 1 injury, and $1,438,746 worth of property damage per year based across 102,659 miles of pipeline. The 10-year (2001–2010) average of significant incidents relating to gas transmission incidents is 2 incidents, 1 fatality, 5 injuries, and $1,240,998 in property per damage per year. This average, taken over a 10-year period, includes 1 fatality that occurred in 2003, and 8 fatalities that occurred in San Bruno in 2010. Furthermore, according to data from PHMSA, when incidents do occur, most injuries due to gas transmission pipeline incidents were to pipeline operator employees or operator contractors, and not to the general public in the vicinity of the pipeline." (FEIR response to comments No. 3.3.)

efficiency without displacing any tenants furthers the General Plan's purposes and is "on balance" consistent with the General Plan. Based on substantial evidence in the record, we conclude that a reasonable person could reach the same conclusion.

## III. CEQA*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. Due Process

Appellants contend the trial court erred in dismissing appellant PMAC's due process claim upon real party's demurrer. We find no error.

The eighth cause of action alleged that as tenants of Parkmerced, members of PMAC hold property rights associated with their rent-controlled units, that they will be displaced by the Project Approvals and the development agreement, that they have a due process right to notice and an opportunity to be heard, and that these rights were violated by the refusal to properly provide notice to them and to allow them to readdress the Board following significant changes to the development agreement and to Project Approvals affecting their property rights. The last-minute changes to the development agreement added provisions that in the event a court challenge invalidates the rent control provision, real party will provide the tenants with relocation assistance and damages that will compensate them for the loss. These changes were made in the attempt to minimize any uncertainty about tenants' ability to retain rent control in the new units whatever the impact of the Costa-Hawkins Rental Housing Act (Civ. Code, § 1954.50 et seq.).

■■■ Appellants acknowledge the well-settled rule that "only those governmental decisions which are adjudicative in nature are subject to procedural due process principles." (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612 [156 Cal.Rptr. 718, 596 P.2d 1134], italics omitted (*Horn*).) "Legislative action generally is not governed by these procedural due process requirements because it is not practical that everyone should have a direct voice in legislative decisions; elections provide the check there. [Citations.]" (*Calvert v. County of Yuba* (2006) 145 Cal.App.4th 613, 622 [51 Cal.Rptr.3d 797]; see *Horn*, at p. 613; *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482 [22 Cal.Rptr.3d 772].) ■■■ Appellants also acknowledge that the approval of a development agreement is a legislative act. (Gov. Code, § 65867.5, subd. (a) ["A development agreement is a legislative act that shall be approved by ordinance and is subject to referendum."]; see

---

*See footnote, *ante*, page 498.

generally *Arnel Development Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511, 523 [169 Cal.Rptr. 904, 620 P.2d 565] (*Arnel*) ["past California land-use cases have established generic classifications, viewing zoning ordinances as legislative and other decisions, such as variances and subdivision map approvals, as adjudicative"].) Nor do appellants dispute that the approvals at issue here are classified as *legislative* acts.

Nevertheless, appellants posit the novel theory that a development agreement, while not a project approval, is an *entitlement* and not a "law of general applicability." Therefore, appellants contend, approval of the development agreement is subject to due process protections, despite its characterization by statute as a legislative action. No case cited by appellants supports this argument—that a legislative act may trigger procedural due process rights when it is arguably not a law of general applicability. Such holding would upset well-established legislative-adjudicative act categorical distinctions and likely would cause uncertainty and confusion. California courts are not required to conduct an individualized assessment into the type of land use decision at issue. (*Arnel, supra,* 28 Cal.3d at p. 517.) In *Arnel,* the California Supreme Court held that a zoning ordinance is a legislative act that may be enacted by initiative, whatever the size of parcel or number of landowners affected, unlike administrative zoning decisions, adjudicatory in nature, such as the grant of a variance or the award of a conditional use permit. (*Id.* at pp. 514–515.) The court emphasized the "problems courts will face if we abandoned past precedent and attempted to devise a new test distinguishing legislative and adjudicative decisions." (*Id.* at pp. 522–523.)

As respondents point out, appellants rely on a handful of cases as supporting the expansion of due process protection where a legislative act "exceptionally affected" a small number of people. (See *Bi-Metallic Co. v. Colorado* (1915) 239 U.S. 441, 446 [60 L.Ed. 372, 36 S.Ct. 141] (*Bi-Metallic*) [distinguishing *Londoner v. Denver* (1908) 210 U.S. 373 [52 L.Ed. 1103, 28 S.Ct. 708], as involving a "relatively small number of persons . . . , who were exceptionally affected, in each case upon individual grounds"]; *Harris v. County of Riverside* (9th Cir. 1990) 904 F.2d 497, 502 [holding that due process applied to zoning ordinance that " 'exceptionally affected' " Harris's land].) None of these cases would apply due process requirements to the approval of a general plan amendment, zoning ordinance or development agreement encompassing 152 acres and affecting renters in more than 1,500 units. (See *Arnel, supra,* 28 Cal.3d at pp. 522–523.) As *Bi-Metallic* recognized in finding no due process right at issue in that case: "Where a rule of

conduct applies to more than a few people, it is impracticable that every one should have a direct voice in its adoption." (*Bi-Metallic,* at p. 445.)[27]

Moreover, insofar as approval of the development agreement requires consideration of broad-based policy issues and the exercise of legislative discretion, it is conduct that does not fit well within the framework of adjudicatory decisions. (See *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 443–444 [120 Cal.Rptr.3d 797] (*Mammoth Lakes*).)[28] Whether or not approval of the development agreement here is conduct applying to more than a few people, it is undisputed that under state law the approval of the development agreement is a *legislative* act. As such, it has long been held that no procedural due process rights attach.

Nor do we find persuasive appellants' theory that because the development agreement granted a vested right to the developer, "locking in" the regulatory framework under which further approvals would be considered, Parkmerced tenants necessarily acquired vested rights entitling them to procedural due process. That the development agreement may provide a vested right to the developer does not necessarily take away vested rights from PMAC or its members. Moreover, courts have repeatedly rejected the claim that an approval should be subject to procedural due process requirements simply because it affects property rights in some manner. Legislative actions often

---

[27] Contrary to appellants' characterization, *Bi-Metallic, supra,* 239 U.S. at page 445, *did not strike down* a Colorado statute that established a procedure for taxing property owners for the cost of street improvements, without affording them prior notice and an opportunity for hearing. Rather, the Supreme Court concluded that an order of the tax commissioner and State Board of Equalization of Colorado requiring local taxing officer to increase assessed valuation *did not violate due process* and it *affirmed* the lower court's order dismissing the action. (*Id.* at pp. 444, 446.)

[28] "A development agreement is a statutorily authorized agreement between a municipal government . . . and a property owner for the development of the property. (Gov. Code, § 65865, subd. (a).) One of the main components of a development agreement is a provision freezing the municipality's rules, regulations, and policies governing permitted uses of land and density of the land use, as well as standards and specifications for design, improvement, and construction. (Gov. Code, § 65866.) This provision allows a developer to make long-term plans for development without risking future changes in the municipality's land use rules, regulations, and policies. (*Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 227 [100 Cal.Rptr.2d 740] (*SMART*).)

"The development agreement must be approved by ordinance and is, therefore, a 'legislative act.' (Gov. Code, § 65867.5, subd. (a).) Because the development agreement is approved by ordinance, it is subject to referendum, which allows the electorate to overturn approval of the agreement. (*Ibid.*) While, as a legislative act, a development agreement can be disapproved by referendum, an unchallenged development agreement is an enforceable contract between the municipality and the developer. Depending on its terms, it may create vested rights in the developer with respect to land use. (See *SMART, supra,* 84 Cal.App.4th at p. 230 [development agreement creates commitments to developers].)" (*Mammoth Lakes, supra,* 191 Cal.App.4th at p. 442.)

involve approvals affecting individual property rights. (E.g., *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 745 [231 Cal.Rptr. 910] (*Oceanside Marina Towers*) [despite "substantial impact on surrounding properties," public entity's selection of a site for a new public improvement consistently has been held to be a quasi-legislative act exempt from due process hearing requirements].)

Appellant contends that under *Horn, supra*, 24 Cal.3d 605, a property owner whose property interest would be directly and significantly affected by granting a vested right to another property has a right to due process. However, *Horn* first concluded that approval of a tentative subdivision map was "adjudicatory" in nature. (*Id.* at p. 614 ["Subdivision approvals, like variances and conditional use permits, involve the application of general standards to specific parcels of real property. Such governmental conduct, affecting the relatively few, is 'determined by facts peculiar to the individual case' and is 'adjudicatory' in nature."].) Only *thereafter* did the court address the argument of the subdivider that the plaintiff neighbor had suffered no significant deprivation of property which would invoke constitutional rights to notice and hearing. As to that point, the court held that "*whenever approval of a tentative subdivision map* will constitute a substantial or significant deprivation of the property rights of other landowners, the affected persons are entitled to a reasonable notice and an opportunity to be heard before the approval occurs." (*Id.* at p. 616, italics added.) In this case, having properly determined the first question, that a legislative act was involved to which act procedural due process did not attach, the trial court was not required to analyze whether the members of PMAC suffered a substantial or significant deprivation of property rights. (See *Oceanside Marina Towers, supra*, 187 Cal.App.3d at p. 744.)

Because the character of the development agreement approval is a legislative act, and it has long been established that procedural due process rights to notice and hearing do not attach to such acts, we conclude the court did not err in sustaining the demurrer to the eighth cause of action.[29]

## V. Administrative Record

Appellants contend the trial court erred in including in the administrative record transcripts of a set of hearings before the LUEDC of the Board. Appellants contend transcripts of the LUEDC hearings were not relevant to the City's decision because these documents were not before the decision maker—the Board—when it certified the EIR for the project on June 6, 2010.

---

[29] Our determination of this issue makes it unnecessary to address respondents' further claim that appellants failed to adequately allege they had insufficient opportunity to present their case against approval of the development agreement and the project to the Board or that they could have been prejudiced by the strengthening of the tenant relocation program protections.

## A. *Facts*

From August 10, 2010, to May 24, 2011, the LUEDC, a committee of the Board, held five meetings to consider the project and development agreement. The last of these was held the morning of May 24, hours before the Board considered and certified the EIR appeal and the project. At both the May 16 and May 24 meetings, the LUEDC discussed and approved amendments to the approvals. At the end of the May 24 hearing, the LUEDC forwarded the amended documents to the Board without recommendation.

On the afternoon of May 24, the Board heard the appeal of the EIR, denied the appeal and approved the project. On June 6, 2011, the Board finalized the Project Approvals. In certifying the EIR, the Board found that "the FEIR files and all correspondence and other documents have been made available for review by this Board and the public. These files are available for public review by appointment at the Planning Department offices at 1650 Mission Street, and are *part of the record* before this Board by reference in this motion . . . ." (Italics added; see Pub. Resources Code, § 21081.6, subd. (a)(2).) (Hereafter, all statutory references are to the Public Resources Code, unless otherwise indicated.) Audio and video files of the LUEDC hearings were televised on SFGovTV and those hearings were generally available for viewing in the Board's offices and on the City's Web site.

Following the filing of their petition for writ of mandate in the superior court, appellants moved to "clarify the record" (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 62 [131 Cal.Rptr.3d 626] (*Madera*), disapproved on other grounds in *Neighbors for Smart Rail v. Exposition Metro Line Const. Authority* (2013) 57 Cal.4th 439 [160 Cal.Rptr.3d 1, 304 P.3d 499]), seeking to exclude from the administrative record transcripts of various hearings on the project, including the LUEDC hearings.[30] The trial court granted the motion in part and ordered: "The transcripts for San Francisco's Historic Preservation Commission hearing on June 2, 2010, and for all of the hearings of the Board of Supervisors' [LUEDC] relating to the Parkmerced Project, are within the scope of the administrative record, and shall be included in the record. The transcripts for these hearings are within the scope of [section] 21167.6. Transcripts of these hearings must be prepared, certified as a true and accurate record of the proceedings, and included in the administrative record. . . ."

---

[30] Respondents contend that as to LUEDC hearings, appellants' motion objected to only the transcript for the May 24, 2011 hearing—the last hearing before the Board's EIR certification. Although the record is not entirely clear, we tend to agree with respondents that only the May 24, 2011 hearing was specifically challenged. However, the court obviously believed appellants were challenging a group of LUEDC hearings. As our analysis applies to the LUEDC hearing of May 24, 2011, it necessarily applies to LUEDC hearings preceding that date as well.

## B. *Standard of Review*

"We review a trial court's determination to include or exclude a document from the administrative record pursuant to the mandatory language of subdivision (e) of section 21167.6 by applying the following ordinary principles of appellate practice. [¶] The trial court's findings of fact are reviewed under the substantial evidence standard. [Citation.] The trial court's conclusions of law are subject to independent review on appeal. [Citation.] [¶] In addition to the foregoing standards of review, appellate review of a trial court's determinations regarding the scope of the administrative record is subject to the principle that appellate courts presume the trial court's order is correct. [Citation.] This presumption produces the corollaries that (1) an appellant must affirmatively demonstrate an error occurred and (2) when the appellate record is silent on a matter, the reviewing court must indulge all intendments and presumptions that support the order or judgment. [Citation.] The intendments and presumptions indulged by the appellate court include inferring the trial court made implied findings of fact that are consistent with its order, provided such implied findings are supported by substantial evidence." (*Madera, supra,* 199 Cal.App.4th at p. 65, fn. omitted.)

## C. *Section 21167.6*

■ As *Madera, supra,* 199 Cal.App.4th 48, recognized: "The contents of the administrative record are governed by subdivision (e) of section 21167.6,[31] which begins: 'The record of proceedings shall include, but is not limited to, all of the following items . . . .' Subdivision (e) then

---

[31] "(e) The record of proceedings shall include, but is not limited to, all of the following items: [¶] . . . [¶]

"(2) All staff reports and related documents prepared by the respondent public agency with respect to its compliance with the substantive and procedural requirements of this division and with respect to the action on the project. [¶] . . . [¶]

"(4) Any transcript or minutes of the proceedings at which the decisionmaking body of the respondent public agency heard testimony on, or considered any environmental document on, the project, and any transcript or minutes of proceedings before any advisory body to the respondent public agency that were presented to the decisionmaking body prior to action on the environmental documents or on the project. [¶] . . . [¶]

"(7) All written evidence or correspondence submitted to, or transferred from, the respondent public agency with respect to compliance with this division or with respect to the project. [¶] . . . [¶]

"(10) Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division." (§ 21167.6, subd. (e).)

enumerates 11 categories of material that must be included in the administrative record. . . . [¶] The quoted statutory language is relevant to establishing the legal context for this appeal. First, the language is mandatory—*all* items described in any of the enumerated categories *shall* be included in the administrative record. [Citation.] Second, the statutory phrase 'include, but is not limited to' indicates the extensive list provided in the statute is *not exclusive*. 'It has been observed that this section "contemplates that the administrative record will include pretty much everything that ever came near a proposed development or to the agency's compliance with CEQA in responding to that development." (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 8 [6 Cal.Rptr.3d 286], italics omitted . . . .)' (*Eureka Citizens for Responsible Government v. City of Eureka*[ (2007)] 147 Cal.App.4th [357,] 366–367 [54 Cal.Rptr.3d 485].)" (*Id.* at pp. 63–64.)

 Section 21167.6, subdivision (e)(10) includes "[*a*]*ny other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project* . . . ." (Italics added.) A broad "interpretation of 'other written materials,' . . . stands in harmony with the introductory language in section 21167.6, subdivision (e) that states the 'record of proceedings shall include, *but is not limited to* . . . .' (Italics added.) This language demonstrates that the Legislature intended courts to avoid narrowly applying the 11 categories set forth in section 21167.6, subdivision (e) when such an application would subvert the purposes underlying CEQA." (*Consolidated Irrigation Dist. v. Superior Court* (2012) 205 Cal.App.4th 697, 718 [140 Cal.Rptr.3d 622] (*CID*).) The audio recordings of the LUEDC hearing (and their later transcriptions) constitute " 'other written materials relevant to' " the agency's " 'decision on the merits of the project' " (*id.* at pp. 714, 716) and, therefore, were *required* to be included in the administrative record.[32] (205 Cal.App.4th at p. 703 ["tape recordings of public agency hearings qualify as 'other written materials' for purposes of [this subdivision], and, therefore, copies of tape recordings should have been included in the record of proceedings that City lodged with the trial court"].)

Relying upon *Western States, supra,* 9 Cal.4th at pages 571–572, appellants contend the LUEDC hearings evidence was not *before the decision makers when they made their decision.* However, *Western States* did not concern the issue of what documents were properly included in the administrative record. Rather, it addressed the issue whether evidence admittedly *not contained in the administrative record* was admissible in a traditional mandamus action under CEQA to determine that the agency had abused its discretion within the

---

[32] The court also properly required transcripts to be prepared for each hearing pursuant to California Rules of Court, rule 2.1040(a), requiring audio recording introduced into evidence to be accompanied by a typewritten transcript. (See *Darley v. Ward* (1980) 28 Cal.3d 257, 263 [168 Cal.Rptr. 481, 617 P.2d 1113].)

meaning of section 21168.5. (*Western States*, at p. 565.) The Supreme Court held, "courts generally may not consider evidence not contained in the administrative record when reviewing the substantiality of the evidence supporting a quasi-legislative administrative decision under . . . section 21168.5" and that "extra-record evidence is generally not admissible to show that an agency 'has not proceeded in a manner required by law' in making a quasi-legislative decision." (*Ibid.*)

Appellants contend that it is not sufficient documents were "available to" the decision makers before they made their decision. *Western States* certainly stands for the proposition that documents generated *after* the Board decision are generally inadmissible on the abuse of discretion issue. However, it nowhere holds that the documents must be identified in the motion affirming certification of the EIR in order to be "before the decision maker." Appellants' attempt to extract support for their position from *CID, supra,* 205 Cal.App.4th at pages 718–723, is unavailing. That part of the *CID* opinion addressed whether documents referenced in comment letters on the DEIR should be included in the administrative record under section 21167.6, subdivision (e)(7). In determining whether such documents were " 'submitted to' " the public agency, the court used the general meaning of "presented or made available for use or study." (*CID*, at pp. 723–724.) The court held documents that were "readily available for use by City personnel" and documents named in a comment letter along with a *specific* Web page at which the document could be easily located, together with a specific request that they be included in the record satisfied the statute; whereas documents referenced with a citation to a general Web site were "not made readily available to City and, therefore, are not part of the record of proceedings under section 21167.6, subdivision (e)(7)." (*Id.* at p. 724.) Not only does this portion of *CID* interpret a different part of the statute, but the question whether documents and other evidence referenced in comment letters by the public are "readily available" to the City is patently distinguishable from the question of the ready availability to the City of the City's own hearings. The court could certainly conclude that members of the Board did not need instruction on where to find the recordings of its committee meetings.

Furthermore, the LUEDC hearings undisputedly occurred *before* the Board's decision. The Board's motion that it had "heard testimony and received public comment regarding the adequacy of the FEIR" is reasonably determined to include public testimony before Board committees. Under the Board's Rules of Order, the full Board did not take separate public testimony on matters that were before a Board Committee. (Board, former Rule of Order 1.5(b), eff. Feb. 15, 2011 ["If a committee has provided the opportunity for public testimony and forwarded an ordinance, resolution, or motion to the full Board, the Board does not provide a second opportunity for public testimony at the full Board meeting"].) Testimony received by the Board as to

the adequacy of the FEIR includes the testimony submitted on project approvals at committee hearings preceding the determination.

Appellants have failed to show that the trial court erred in determining the LUEDC hearings were properly part of the administrative record.

## D. *No Prejudice*

Finally, we agree with respondents that even if the LUEDC committee's transcripts were not part of the administrative record, the trial court's order of inclusion would not constitute reversible error, absent a showing by appellants as to how they were prejudiced by the inclusion of the transcripts. Appellants have not tried to demonstrate actual prejudice, but rely upon a theory that *any* violation of CEQA's procedural mandates is "presumptively prejudicial," citing *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 137 [65 Cal.Rptr.2d 580, 939 P.2d 1280].[33]

■ Recently, our Supreme Court has explained: "An omission in an EIR's significant impacts analysis is deemed prejudicial if it deprived the public and decision makers of substantial relevant information about the project's likely adverse impacts. Although an agency's failure to disclose information called for by CEQA may be prejudicial 'regardless of whether a different outcome would have resulted if the public agency had complied' with the law (§ 21005, subd. (a)), *under CEQA 'there is no presumption that error is prejudicial'* (§ 21005, subd. (b)). Insubstantial or merely technical omissions are not grounds for relief. ([*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008)] 44 Cal.4th [459,] 485–486 [80 Cal.Rptr.3d 28, 187 P.3d 888].) 'A prejudicial abuse of discretion occurs if the *failure to include relevant information* precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citation.]" (*Neighbors for Smart Rail v. Exposition Metro Line Const. Authority, supra,* 57 Cal.4th at p. 463, italics added.)

■ Insofar as prejudice resulting from the inclusion of *too much information* in the administrative record is concerned, the court in *County of*

---

[33] In *Mountain Lion Foundation,* the court held the Fish and Game Commission had abused its discretion in delisting the Mojave ground squirrel where it failed to respond in writing to significant environmental opposition and gave no meaningful consideration to the "no project" alternative to delisting the species. Consequently it did not proceed in accordance with procedures mandated by law. The court cited *Sierra Club v. State Board of Forestry* (1994) 7 Cal.4th 1215, 1235–1237 [32 Cal.Rptr.2d 19, 876 P.2d 505], and in brackets characterized its holding as "[failure to proceed in accordance with law presumptively prejudicial when mandatory procedures not followed]." (*Mountain Lion Foundation, supra,* 16 Cal.4th at p. 137.)

*Orange v. Superior Court, supra*, 113 Cal.App.4th 1, had this to say: "[W]hen it comes to the administrative record in a CEQA case, any *reduction* in its contents is *presumptively* prejudicial to project proponents. [Citation.] It is, after all, the project proponents who will be saddled with the task of pointing to things in the record to refute asserted inadequacies in the EIR. By all rights, then, *the burden of showing prejudice from any overinclusion of materials into the administrative record must be on the project opponents*, who have the most to gain from any underinclusion. [Citations.]" (*Id.* at p. 13, some italics added.) We agree.[34]

## DISPOSITION

The judgment in favor of respondents is affirmed.

Richman, J., and Brick, J.,* concurred.

On September 4, 2014, and September 5, 2014, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied November 19, 2014, S221844.

---

[34] Appellants' motion to strike portions of respondents' answer to the brief of amici curiae Sierra Club and California Preservation Foundation has been granted in part in our order filed October 28, 2013. We hereby deny the motion as to the remaining portions of respondents' answer to the amici curiae brief.

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.